## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| **Shannon Perry, on her own behalf,** | | |
| **and on behalf of her son,** | | |
| **A.M.** | | |
| | § | |
| | § | **JURY TRIAL REQUESTED** |
| **Plaintiff** | § | |
| | § | **CIVIL FILE NO:** |
| **vs.** | § | |
| | § | |
| **Lorain City School District,** | § | **REDACTED COMPLAINT** |
| | § | |
| **Defendant.** | § | |

## I.    INTRODUCTION

1. This is an action by Plaintiff Perry, a parent of a disabled child, and Plaintiff, A.M., a student with a disability, being schooled by the Lorain City School District. Plaintiffs seek protection against and damages for retaliatory action taken by the Lorain City School District ("the District") in response to efforts to secure reasonable accommodations, their federally protected complaints to the District and to the United States Department of Education's Office of Civil Rights (OCR).

2. The District's actions, set forth more fully herein, violate section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §794, and Title II of the Americans with Disabilities Act (ADA, ADA-AA), 42 U.S.C. §12131.

3. For relief, Plaintiffs seek injunctive remedy of non-retaliation, compensatory damages for the significant emotional and financial harm caused by the District, and punitive damages for the District's retaliation for Plaintiffs' exercise of federally guaranteed rights, along with attorneys' fees and costs.

1

4.  The Plaintiffs are A.M, a seven-year old student of the District, and his mother, S.P.

5.  Plaintiffs are residents of Lorain County, Ohio, and citizens of the United States. They live in Lorain, Ohio.

6.  Defendant, Lorain City School District, is a local school district organized under the laws of Ohio. It is a local education authority, and it is responsible for avoiding discrimination on the basis of disability, for providing related aids and services to students with disabilities, for complying with Ohio law, and for resisting retaliation against persons who make good faith complaints of discrimination/retaliation/failure to accommodate.

7.  The District is bound by the Americans with Disabilities Act,[1] and its amendments, as well as section 504 of the Rehabilitation Act.[2]

## II. JURISDICTION AND VENUE

8.  This action arises under the laws of the United States, and therefore this Court has jurisdiction pursuant to 28 U.S.C. §1331 (federal question).

9.  This action also arises under the following federal statutes: The Americans with Disabilities Act of 1990 (ADA), Pub.L. No. 101-336, 104 Stat. 327 (1990), 42 U.S.C. § § 12101 et seq., amended by the Americans with Disabilities Amendments Act (ADA-AA) with an effective date of January 1, 2009, which, at Title II of the ADA, prohibits discrimination in the provision of public services. Section 202 of the Act, 42 U.S.C. §12132 (Supp.1991), the Rehabilitation Act of 1973, §§504 and 505, as amended, 29 U.S.C.A. §§794 and 794a, including the conforming amendment of the ADA-AA which changes the definition of "disability" under §504 to conform to the definition of "disability" under ADA-AA. Both

---

[1] The District is a covered "public entity" under the ADA. Title II's definition of "public entity" includes "any department, agency, special purpose district, or other instrumentality of a State or States or local government." 42 U.S.C. 12131(1)(B).

[2] Similarly, the District is covered by the Rehab Act because it receives federal financial assistance.

the ADA and §504 prohibit retaliation against persons with disabilities, or persons who advocate on behalf of a student's education or who have filed a complaint with the Office of Civil Rights (OCR).

10. Venue is properly in this Court pursuant to 28 U.S.C. §1391, in that all parties reside in this Judicial District and the matters at issue arose in this Judicial District.

### III.  LEGAL AND FACTUAL BASIS FOR THIS LAWSUIT

11. Cast in negative terms, Section 504 of the Rehabilitation Act, 29 U.S.C § 794, bars all federally funded entities (governmental or otherwise) from discriminating on the basis of disability. Section 504 states, in relevant part:

> No otherwise qualified individual with a disability in the United States ... shall, solely by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service. 29 U.S.C. § 794(a).

12. Defendant School District receives federal financial assistance and is covered by Section 504.

13. The Americans with Disabilities Act of 1990, at 42 U.S.C. § 12132, with its Amendments effective January 1, 2009, extends the nondiscrimination rule of section 504 of the Rehabilitation Act to services provided by any "public entity" (without regard to whether the entity is a recipient of federal funds).

14. Title II of the ADA prohibits discrimination by retaliation against any person who has a disability and against any individual who has assisted a person with a disability. 42 U.S.C. § 12203(a), §12203(b) and § 12203(c). No person shall discriminate against any individual

3

because such individual has opposed any act or practice made unlawful by this Act or because such person made a charge, testified, assisted or participated in any manner in an investigation, proceeding or hearing under this Act. § 12203(a). It is unlawful for a public entity to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by this Act. § 12203(b). The remedies and procedures under 42 U.S.C. §§ 12117, 12133, 12188 shall be available to aggrieved persons for violations of subsections (a) and (b) with respect to Title II. 42 U.S.C. § 12203(c).

15. A plaintiff who is not disabled can allege an associational claim pursuant to the ADA under Title 2, 42 U.S.C. 12203 and in conjunction with Section 504. See, e.g. *Rogers v. International Marine*, 87 F.3d 755 (5th Cir. 1996); *Jackson v. Serv. Eng'g., Inc*., 96 F. Supp. 2d 873, 882 (S.D. Ind. 2000) (denying motion for summary judgment where defendant terminated plaintiff because of plaintiff's wife's illness). Congress intended the ADA and its amendment, the ADA as Amended (2009) to stamp out discrimination against persons with disabilities and to do so include protection for individuals who aid or encourage persons with disabilities

16. Both 504 and the ADA prohibit retaliation against any person who has advocated on behalf of a child's education, or participated in a proceeding concerning the child's education.

17. Plaintiff A.M. is an individual with a disability such that he has a physical or mental impairment that substantially limits one or more major life activity, a record of his impairment exists and he is regarded as having such impairment(s). 42 U.S.C. § 12102

18. Plaintiff A.M. has a diagnosis of Autism and other complex medical needs, including obstructive sleep apnea, aspiration issues and liver disease.

19. Autism Spectrum Disorder is a neurological disorder that substantially limits an individual's functioning. Many individuals with ASD, like A.M., display significant social, communication, sensory, and behavioral challenges. A.M. lacks the skills to express basic ideas and needs.  A.M. has difficulty adapting to changes within their environment and can become overwhelmed by seemingly typical environmental stimuli. Individuals with ASD, such as A.M., lack the ability to regulate their emotions which often leads to maladaptive behaviors. Many, such as in A.M.'s case, have difficulty maintaining attention to tasks. A.M. also exhibits deficits in gross motor functioning. These challenges limit many major life activities such as: caring for oneself, performing manual tasks, walking, standing, lifting, bending, speaking, learning, concentrating, thinking, communicating, and working.

20. Plaintiff A.M.'s medical diagnoses of obstructive sleep apnea, frequent aspiration episodes, and liver disease limit his major bodily functions such as eating, breathing and sleeping.

21. Accordingly, Plaintiff A.M. needs various reasonable accommodations in the school setting, including assistance with self-regulation such as access to staff members and designated areas, prompting, redirection, opportunity for frequent monitoring during food consumption to avoid aspiration, and access to breathing treatments.

22. Starting minimally with the 2017-2018 school year, the parent, Plaintiff S.P., engaged in a protected activity under the ADA-AA and Section 504 by advocating for her disabled child; to ensure that he had reasonable accommodations.

23. Plaintiffs assert that Defendant subjected Plaintiff S.P., parent of A.M. to discrimination contrary to the ADA because of her efforts to advocate for A.M.

24. In May 2018, Plaintiff S.P. was informed by Defendant that A.M. would no longer be receiving transportation to/from school, that he was having behavioral challenges, medical issues and occupational therapy needs at school. She advocated for the Defendant to address these issues through the context of A.M.'s individualized educational programming at a meeting on or about May 23, 2018.

    a. The District's response was to deny all requests by Petitioner. Specifically, the Executive Director of Student Services told District staff to "we need to ensure that we have data to support to not support need" because "mom sure is asking for a lot all of a sudden."

    b. In May 2018, the District refused to provide him with transportation as required by his IEP. Rather, the District unilaterally determined that A.M. did not require specialized transportation due to District policies and not based upon the student's needs.

        a) In August 2018 the District decided to provide transportation, however, it was never provided appropriately or consistently.

25. Plaintiff Perry continued to advocate for A.M. to have reasonable accommodations into the 2018-2019 school year.

    a. Specifically on or about August 7, August 28, September 12, September 21, September 25, October 23, and November 6, 2018, Ms. Perry advocated for A.M. to be provided a paraprofessional, requested a functional behavior assessment be conducted, that a behavioral intervention plan be drafted and implemented, that the District consider sensory accommodations and collaborate with her to address A.M.'s escalating behavior.

26. At the beginning of the 2018-2019 school year, A.M.'s behaviors, including hitting, kicking, running around, being loud and disruptive, increased significantly. A.M. is suspended from school initially for just one (1) day due to aggression towards peers and staff.

27. On or about September 20, 2018, the IEP team unilaterally, outside of an IEP team meeting and without discussion with Petitioner, determined that A.M. would not require a paraprofessional to assist in managing his behaviors. In fact, the District discussed that they felt that Petitioner Perry was reaching out to too many other individuals and it was their "hope that no one gives in" to her.

28. On September 21, 2018 the IEP team met to discuss a change in placement due to A.M.'s aggressive behavior. The District stated A.M. could attend their program at Toni Morrison Elementary or Helen Steiner Rice Elementary in either the Gifted or E.D. classrooms or remain at Garfield Elementary. Petitioner agreed to tour both facilities. During this meeting, the District stated that A.M.'s behavioral challenges within the general education setting had thus far been supported by team. This was untrue. A.M. was not provided gifted services or access to evidence based behavior interventions.

   a. Petitioner Perry continued to advocate for the District to provide reasonable accommodations to her son. She requested a functional behavior assessment, a positive behavior reinforcement plan be developed and implemented, and a paraprofessional be provided to work with A.M. when his challenging behaviors were present.

29. On or about September, 25, 2019, due to an increase in disruptive behaviors, the District chose to place A.M. on a half day schedule.

7

30. At an IEP meeting in October 2018, the IEP team finally identified A.M.'s need for OT services and amended the IEP to include those services. However, the District refused to implement these services because Petitioner Perry would not sign in agreement with the IEP. It was not until Ms. Morell felt she could twist Petitioner Perry's words into an agreement that she would allow the District to proceed with services.

31. In response to a PR01 issued by the District purportedly summarizing the October 23, 2018 IEP meeting, Petitioner Perry issued a letter response indicating her disagreement with the accuracy of the PR01. Specifically, the PR01 indicated that Ms. Perry was not in agreement with lengthening A.M.'s school day when in fact Ms. Perry wanted to, but with the completion of an FBA so as to have an appropriate plan in place to minimize further trauma to A.M.

32. On or about October 31, 2018, A.M. engaged in behaviors as identified in his IEP, which resulted in pinching/twisting of his teacher's wrist. This event took place on Halloween, a day that was uncharacteristic of a typical schedule and largely unstructured. It has been identified through testing that A.M. struggles without structure in his environment. The District did not appropriately plan or prepare for how this would affect A.M. The District emergency removed him from school on that day.

    a. Earlier in the day, prior to the "pinching/ twisting arm" incident, the District removed A.M. from the classroom to the office and called Petitioner. It was reported to Petitioner that A.M. was engaged in behaviors of running around the classroom, rolling around on the carpet and would not adhere to staff direction. Staff responses to this behavior were to engage A.M. with inappropriate interventions such as "we are going to call your mom," and "we are not going to chase you." After taking A.M. to

the office for a while to "settle down" the District returned him to the classroom. District staff were unable to identify what the antecedent was to the behavior - though the staff were to be collecting data for the functional behavior assessment. It is clear that the staff were not appropriately trained in behavioral interventions for a student with autism nor were the staff appropriately collecting data for a functional behavior assessment.

33. The initial incident report stated that A.M.'s behavior was categorized as disobedient, disruptive, disorderly and disreputable.  It states that A.M. pinched his teacher's wrist.

34. The District's Attack Review Board ("ARB") scheduled a hearing regarding the October 31, 2018 incident to determine whether an attack did or did not occur. If the ARB determined that an attack did occur, it would recommend a discipline. It was clear to Petitioner that the ARB would not be determining A.M.'s placement.

    a.  The ARB hearing took place on December 10, 2018.

    b.  The ARB issued a decision on or about December 13, 2018 that an attack did occur, acknowledged that A.M. was on home instruction and that placement should be determined by the IEP team.

    c.  It is clear that the ARB did not make any determination regarding A.M.'s placement.

35. At an IEP meeting on or about November 6, 2018, the IEP team determined that A.M.'s needs were such that he required a paraprofessional all day, every day, to assist with self-regulation. It was determined that a substitute teacher would be present to work with him while the District hired a paraprofessional and that it may be a different person each day until an appropriate parapro was hired. The District also decided to keep A.M. on an abbreviated schedule until the aide was hired.

36. When the District acquiesced to providing A.M. with a paraprofessional during the school day in November 2018, Plaintiff Perry remained at school in the office to see how A.M. adjusted to the new staff member. Until a trained paraprofessional was hired, the District agreed to provide a substitute teacher.

37. On or about November 9, 2018, A.M. was starting his first day with his 1:1. Given that the staff had significant difficulties with A.M.'s behavior and because A.M. has autism which requires preparation for new routines, Petitioner Perry brought A.M. into school at 8:00 am to meet his new substitute teacher. Petitioner Perry requested to remain in the office for a little bit in case A.M. did not handle the transition to the substitute well, and engaged in aggressive behaviors warranting discipline since the staff did not have the appropriate training to employ interventions with him to de-escalate the behaviors.

   a. The principal Ms. Young indicated that it was fine for Petitioner Perry to remain in the office and gestured to a chair. Petitioner Perry sat in the chair in the office for an hour without engaging with a single person.

   b. At approximately 9:00 am a police officer comes into the office, walks to Ms. Young's office and then requests Petitioner Perry to follow him inside the nurse's office. Once inside, he indicates that he was called because Petitioner Perry was requested to leave numerous times and refused to do so. He further discussed with Petitioner Perry that he has done some recent training at a nearby facility that may be a good fit for her son. Petitioner Perry requested to leave and the officer allowed her to do so.

   c. In the morning prior to the arrival of a police officer, there was no further interaction between school staff and Petitioner Perry after the introduction of the substitute

teacher and A.M. other than for Petitioner Perry to request to wait in the office and Ms. Young's agreement.

d.  When Petitioner Perry came back to the school at 11:30 am to pick her son up as he was on an abbreviated school day schedule, she was informed by the substitute that A.M. struggled behaviorally to adjust to the presence of an aide. Petitioner Perry asked Ms. Young why she would have had her sit in the office for an hour that morning rather than informing her of the behavioral issues while she was there. Ms. Young refused to answer and instead continued to inform her that she is no longer allowed to come into the office anymore regardless of whether she is dropping off or picking up her son. Ms. Young's response was that she would go about the situation another way.

e.  The receptionist agreed that Petitioner Perry did not engage with any school staff in the morning and she further agreed that Petitioner Perry did not behave inappropriately when conversing with Ms. Young at the 11:30 am pick up.

f.  Although Ms. Young indicated to Petitioner Perry at this time that she was no longer allowed in the office for any reason, it was the understanding of the receptionist that Petitioner Perry was not banned from the building.

g.  Petitioner Perry left Garfield Elementary school and went directly to the Administration Building to lodge a complaint against Ms. Young for her statements. To date, the District has not taken any action on the complaint lodged by Petitioner Perry.

38. On or about November 12, 2018, when Petitioner Perry was picking up her son from school at 11:30 am, a police officer met her and served her with a Notice of Exclusion ("ban

11

papers") from Lorain City School Properties. This Notice advised Petitioner that she was banned from all District properties, but would be able to drop off/pick up her son from school provided she did not leave her car.

    a.    Petitioner Perry called Chief Operations Officer Mr. Hawkes to request information regarding why she received ban papers. Mr. Hawkes indicated that the staff reports as to the threatening behavior of Petitioner Perry were confidential but that she would get a copy of them at the ARB. These reports were never provided.

39. A.M. was placed on home instruction effective November 26, 2018 because the District determined they could no longer address his behavioral issues in the classroom setting.

40. On or about November 28, 2018, Petitioner contacted the District regarding an appeal process regarding the "banning" notice. A third party contacted the Chief Operations Officer, on behalf of Petitioner, regarding the ban and the Officer indicated that there is no written policy when someone threatens staff or kids and there is no appeal process.

    a.    There was never a threat to staff or kids - neither verbally, physically or through behavior.

    b.    The lack of an appeal process contradicts every PR01 and statement by other District staff that would refer Petitioner Perry to the Chief Operations Officer; further this is a denial of due process to Petitioner.

41. A second PR01 issued on December 12, 2018 notes that Petitioner Perry is encouraged to set up a meeting with the District regarding her "banning" papers. On or about December 19, 2018, Petitioner Perry emailed the District requesting a hearing regarding the District's decision to ban her from all District property.

12

    a.  It is notable that the District administration keeps advising Petitioner Perry to meet and address her ban with the Chief Operations Officer when they knew that there was no policy or process to have it addressed.

42. On or about March 12, 2019, Petitioners were informed via email that A.M.'s home instruction would be ending on March 15, 2019. There was no IEP team meeting or discussion regarding this termination of services.

43. Petitioner Perry emailed the District on or about March 18, 2019 that A.M. would be returning to Garfield Elementary as there had been no agreed upon change in placement for A.M. and Garfield Elementary was the last agreed-upon and implemented placement.

    a.  On March 19, 2019, Petitioner Perry drove A.M. to Garfield Elementary for school. Pursuant to her "ban papers" she stayed in her car and waited for A.M.'s aide to come out of the building to escort him from the car to the building. After about 10 minutes, an administrator came out to the car and asked Petitioner Perry if there was something she could assist her with. Ms. Perry responded that her son's name was A.M. and that she was waiting for his aide; the administrator asked for the aide's name, which Ms. Perry responded she did not know the name and to which the administrator said she would go inside the building and find the aide.   The administrator never came back out to talk to Ms. Perry.

    b.  While Ms. Perry was waiting in her car with A.M. for his aide to escort him to school, she returned a call to District employee, Ms. Morell, to discuss A.M.'s placement at school. During this telephone conversation, Ms. Perry indicated that she was leaving the school premises due to Ms. Morell's refusal to allow A.M. to attend school there. Ms. Perry indicated that she was in disagreement with Ms. Morell's assertion

13

regarding the educational placement options for A.M. and was requesting his stay-put placement. Ms. Perry indicated to Ms. Morell that her understanding was that A.M.'s stay-put placement was at Garfield Elementary and as such, she would be bringing A.M. to Garfield the following morning.

44. On March 20, 2019, Petitioner again brings her son to school at Garfield Elementary at 8:00 am. While she was waiting in the parking lot pursuant to her ban papers, an officer comes and takes pictures of her license plate/car. Ms. Perry rolls her window down and asks him what is going on. He indicates that he has called the Lorain City Police Department because she is not to be on the property due to her son being on home instruction.

    a. Lorain Police Officer Reuben Figueroa arrived and conversed with Ms. Perry. He cancelled the call for additional Lorain Police officers and indicated to Ms. Perry that Ms. Morell had sent him an email that A.M. was not enrolled at Garfield Elementary.

    b. Petitioner Perry left Garfield Elementary and went to the office of the Mayor of the City of Lorain to discuss the issues she was having with the District. The Mayor's Office is located in the same building at the Police Department. While she was in the building, Officer Figueroa talked with Ms. Perry and indicated that she should bring with her any documentation she had that her son is enrolled at Garfield with her when she dropped her son off at school the next day. This was seconded by the Mayor's Office.

    c. The Mayor's Office also followed up with the District and requested records, which were never provided.

45. On March 21, 2019, Petitioner Perry attempted to take her son to school and brought with her significant documentation evidencing his enrollment (i.e. gifted paperwork, lunch

14

program, report cards, suspension papers, positive office referral). However, she was met with the Lorain City Police Officers, was presented with a summons for trespassing and told she was never to come back to Garfield Elementary again.

    a.    Notably, Petitioner learned that on or about March 20, 2019, without notice to Petitioners, Ms. Morell unilaterally changed A.M.'s location of services to Steven Dohanos Elementary and ordered that all his records be shifted to that building.

46. Despite the District's continued assertion that it was attempting to work with Petitioner on placement for A.M., the actions demonstrated a consistent pattern of discrimination and retaliation. The District was determined to force Petitioner to stop advocating for A.M.

47. The Defendant retaliated against Plaintiff Perry for engaging in the protected activity of advocating for her disabled son by calling the police on her, banning her from the school district property and having her criminally charged.

48. Defendant further interfered with Plaintiff Perry's ability to observe her child in school and participate in school functions like parents of non-disabled children.

49. Defendant deprived Plaintiff Perry in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by the ADA.

50. Plaintiffs continue to fear that the District will take further retaliatory action against them due, in part, to the District's banning of Plaintiff Perry from the District property and calling the police several times without notice to Plaintiff.

51. Plaintiffs now file this suit in the United States District Court to address Defendant's retaliatory actions against these Plaintiffs.

## IV. LEGAL CAUSES OF ACTION

52. The foregoing paragraphs are incorporated herein.

53. Based thereon, Plaintiffs bring the following legal causes of action against the District:

       a.  Retaliation under Section 504 of the Rehabilitation Action

       b.  Retaliation under Title II of the ADA/ADA-AA

54. Plaintiffs respectfully pray for the following relief:

       a.  Injunctive relief proscribing any further retaliation against A.M. or his parent, Ms. Perry;

       b.  An award of appropriate compensatory damages, specifically monetary damages that exceed the amount of Seventy-Five Thousand dollars ($75,000.00) under the ADA and the Rehabilitation Act (or either of them), for the intentional and retaliatory violation of Plaintiffs' rights, and

       c.  An award of costs and reasonable attorneys' fees,

**55. A TRIAL BY JURY IS HEREBY DEMANDED.**

                        Respectfully submitted,

                        */s/ Michelle K. McGuire*

                        _____

                        Michelle K. McGuire (0076553)
                        PO Box 81804
                        Cleveland, Ohio 44181
                        (440) 396-7844
                        Michelle.attorney@gmail.com
                        Attorney for Plaintiffs